IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Companion Property and Casualty Insurance Company, | ) ) ) | Civil Action No.: 3:17-cv-00514-CMC |
| Plaintiff, | ) ) | |
| vs. | ) ) | COMPLAINT |
| Charles David Wood, Jr.; AMS Staff Leasing, Inc.; Breckenridge Enterprises, Inc.; and AMS Staff Leasing II, Inc., | ) ) ) ) | |
| Defendants. | ) ) ) | |

Companion Property and Casualty Insurance Company n/k/a Sussex Insurance Company ("Companion"), through counsel, hereby files this Complaint against Defendants Charles David Wood, Jr. ("Wood"), AMS Staff Leasing, Inc. ("AMS"), AMS Staff Leasing II, Inc. ("AMS II"), and Breckenridge Enterprises, Inc.("Breckenridge") (collectively, "Defendants"), and will show the Court as follows:

**THE PARTIES**

1.      Companion is a South Carolina corporation that maintains its principal place of business in Richland County, South Carolina.

2.      Wood is an individual who, upon information and belief, is a citizen and resident of Texas. Upon information and belief, Wood's home address is 5518 Winston Court, Dallas, TX 75220, and his business address is 4455 LBJ Freeway, Suite 1080, Dallas, TX 75244. Upon information and belief, Wood has owned and operated multiple businesses out of the same address in Dallas, TX (4455 LBJ Freeway, Suite 1080, Dallas, TX 75244). Upon information and belief, Wood has owned and operated U.S. domestic insurance companies, foreign

reinsurance companies, insurance agencies, insurance third party administration services companies, and professional employer organizations ("PEOs") that contractually assume employer rights, responsibilities, and risks with employees who are then leased by the PEOs to various clients, primarily those engaged in the construction industry. Wood has personally conducted business and entered into contracts with Companion, individually and through his businesses, including guaranty and indemnity agreements and coverage agreements (more fully described below), both directly and by using the names of his current and former companies.

3.      Upon information and belief, AMS is a PEO and corporation organized under the laws of Florida with its principal place of business in Texas. Upon information and belief, AMS's principal business address is 4455 LBJ Freeway, Suite 1080, Dallas, TX 75244. Upon information and belief, Wood is the president and owner of AMS. Upon information and belief, in or around 2013, Wood surreptitiously sold all of AMS's assets to Essential HR, Inc. ("Essential HR") without Companion's knowledge or consent in exchange for an ongoing commission or other remuneration in connection with the business of AMS.[1] Upon information and belief, as a result of the sale or liquidation of AMS's assets, AMS is now a shell company with no assets. Upon information and belief, on or around March 16, 2016, Wood dissolved or attempted to dissolve AMS by filing Articles of Dissolution with the Florida Secretary of State.

---

[1] Upon information and belief, Essential HR is a corporation organized and in good standing under the laws of Illinois with its principal place of business in Texas. Upon information and belief, Essential HR's principal business address is 4455 LBJ Freeway, Suite 1080, Dallas, TX 75244—the same address as all of the named Defendants entities. Upon information and belief, Essential HR has operated as and/or done business under various assumed names, including Innovative Staffing; Highpoint Resources, Inc; and Sterling HR Solutions. Upon information and belief, Lynn Hanson owns all of the outstanding shares of Essential HR. Upon information and belief, Highpoint Administrative Services, Inc. is another related entity that commingled assets and employees with, and operated out of the same address as, Essential HR and Defendants.

4.      Upon information and belief, AMS II is a PEO and corporation organized and in good standing under the laws of Florida with its principal place of business in Texas. Upon information and belief, AMS II's principal business address is 4455 LBJ Freeway, Suite 1080, Dallas, TX 75244. Upon information and belief, Wood is the president and owner of AMS II. Upon information and belief, on or around March 16, 2016, Wood dissolved or attempted to dissolve AMS II by filing Articles of Dissolution with the Florida Secretary of State.

5.      Upon information and belief, Breckenridge is a PEO and corporation organized and in good standing under the laws of Texas with its principal place of business in Texas. Upon information and belief, AMS II's principal business address is 4455 LBJ Freeway, Suite 1080, Dallas, TX 75244. Upon information and belief, Wood owns all of the outstanding shares of Breckenridge.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1332, because Companion is a citizen of a state different than the states in which Defendants are citizens, and the amount in controversy exceeds $75,000.

7.      Each Defendant has sufficient minimum contacts with South Carolina to support the District Court's exercise of specific personal jurisdiction over him or it in this case, including the following:

    a. Each Defendant has purposely availed himself or itself of South Carolina's laws and regulations by, inter alia, doing substantial business with Companion, a South Carolina corporation, and subjecting that business to South Carolina law;

    b. Defendants have entered into contracts to do business with Companion, and have subjected those contracts to South Carolina law;

3

c. Defendants, through their representatives, have made personal visits to Columbia, South Carolina, in furtherance of its/his business with or involving Companion; and/or

d. Each Defendant or its/his representatives has sent various communications and documentation to Companion in Columbia, South Carolina in furtherance of its/his business with or involving Companion.

8. Defendants are additionally and independently subject to personal jurisdiction in South Carolina because each of them specifically consented to personal jurisdiction in South Carolina in the Forum Selection Clause of the Coverage Agreement between the parties effective as of December 1, 2006 (the "2006 Coverage Agreement") and/or the contractual extensions thereto. Specifically, Defendants agreed that:

a. the state and federal courts of South Carolina would be the exclusive forum for litigating any dispute connected to the 2006 Coverage Agreement;

b. the state and federal courts of South Carolina would possess jurisdiction over each of them; and

c. the state and federal courts of South Carolina would be a convenient and proper forum for litigation between each of them and Companion.

9. Wood is additionally and independently subject to personal jurisdiction in South Carolina because he specifically consented to personal jurisdiction in South Carolina in the Forum Selection Clause of the Guaranty and Indemnity Agreement he personally executed in favor of Companion dated as of December 1, 2006 ("Guaranty Agreement"). Specifically, Wood agreed that:

a. the state and federal courts of South Carolina would be the exclusive forum for litigating any dispute connected to the Guaranty Agreement;

b. the state and federal courts of South Carolina courts would possess jurisdiction over him; and

c. the state and federal courts of South Carolina would be a convenient and proper forum for litigation between Wood and Companion.

4

10.     Venue is proper in the District of South Carolina, Columbia Division, pursuant to the Forum Selection Clauses of the 2006 Coverage Agreement and attendant Guaranty Agreement.

11.     Additionally, venue is proper in the District of South Carolina, Columbia Division, pursuant to 28 U.S.C. § 1391, because a substantial portion of the events giving rise to the dispute between Companion and each of the Defendants occurred in Columbia, South Carolina.

## FACTUAL ALLEGATIONS

12.     Wood, an insurance professional with many years of experience owning and operating PEOs and managing the workers' compensation insurance risk associated with his companies, acquired Dallas Fire Insurance Company on or about February 11, 2003, in order to, among other things, increase the profitability of his PEOs—AMS, AMS II, Breckenridge, Personnel Advantage East, Inc. ("AEI"), and Equity Group Leasing I., Inc. ("EGLI") (collectively, the "Wood PEOs"))—by removing Wood's need to buy insurance from third-party insurers.

13.     Upon information and belief, AEI was a PEO and corporation formed under the laws of Florida that was dissolved on or around September 14, 2007. Upon information and belief, EGLI was a PEO and corporation formed under the laws of Florida that was dissolved on or around December 31, 2011.

14.     On or around August 24, 2005, Wood acquired California Indemnity Insurance Company. Wood changed its name to Dallas National Insurance Company ("Dallas National") on December 6, 2005. Dallas National is now known as Freestone Insurance Company in Liquidation. Upon information and belief, Wood formed a wholly owned and controlled holding

company, DNIC Insurance Holdings, Inc., on October 31, 2005, to subsequently hold his 100% interest in Dallas National. On January 2, 2006, Wood merged Dallas Fire Insurance Company into Dallas National, effective December 31, 2005.

15.     In 2005, Wood formed Highpoint Risk Services, LLC ("Highpoint"), his wholly-owned managing general agency ("MGA"), to issue policies to the Wood PEOs and to third parties. Wood used Highpoint to establish a distribution network comprised of over 450 independent agency and broker relationships throughout sixteen (16) states. The number of independent agency and broker relationships decreased to approximately 404 as of 2013. Wood also formed Aspen Administrators, Inc. ("Aspen"), a wholly-owned third-party claims administrator, so that he could directly handle insurance claims for his own PEOs and Dallas National's other insureds.

16.     For certain Wood PEO clients, Dallas National could not offer the insurance they sought because it either did not possess the required strong credit rating, such as an "A" rating from A.M. Best, or was not licensed to provide insurance in the requested jurisdiction(s).

17.     Pursuant to a Coverage Agreement and attendant agreements effective as of December 1, 2005, Wood and certain of his companies—namely, AMS, AMS II, AMS Staff Leasing, NA ("AMS NA"), AEI, EGLI, and Dallas National—entered into a contractual program with Companion whereby workers' compensation policies were to be issued to policyholders on Companion "paper" (*i.e.*, Companion insurance policy forms).

18.     This contractual program allowed Wood and his companies to offer insurance in states where Dallas National was not licensed, as well as to offer access to Companion's highly-rated workers' compensation insurance.

19.    As part of the contractual program with Companion, Wood arranged for 100% reinsurance of all liabilities on the Companion policies, with the first layer of such reinsurance provided by his own company, Dallas National. In or around 2011, Wood acquired Redwood Reinsurance SPC, Ltd. ("Redwood"), a Cayman Islands reinsurer owned and operated by Wood until his sale of the company on or about May 22, 2012, in order to, among other things, lessen the downward pressure on Dallas National's A.M. Best rating as a result of the volume of business it was reinsuring, and Wood began to reinsure certain Companion policies on a 100% basis through Redwood instead of Dallas National.[2]

20.    This contractual arrangement described above is known in the insurance industry as a "fronting" program. As the fronting insurer, and pursuant to the operative agreements between the parties described further below, Companion was to incur no risk whatsoever; it merely received a fee, calculated on the gross premium written, for having policies issued on its paper backed by its financial strength, with 100% of the risk assumed by the policyholders and Wood's reinsurers (Dallas National and Redwood) and, ultimately, by Wood himself pursuant to the unconditional Guaranty Agreement he executed in favor of Companion (discussed further below).

---

[2] On March 1, 2012, Wood and DNIC Insurance Holdings, Inc. ("DNIH"), on the one hand, and Lonestar Holdco, LLC ("Lonestar"), on the other, entered into a transaction pursuant to which Wood and DNIH agreed to sell, and Lonestar agreed to buy, Redwood and Freestone Insurance Company (formerly Dallas National). Upon information and belief, Freestone Insurance Company and Redwood were sold in exchange for, among other things: (1) a $20 million surplus note issued by Freestone Insurance Company to DNIH; and (2) preferred membership interests in Lonestar held by DNIH (33.33%) and Wood (66.66%). Upon information and belief, the sale of Redwood closed on May 22, 2012, and the sale of Freestone Insurance Company closed on March 12, 2013. Upon information and belief, while both Redwood and Freestone Insurance Company became wholly-owned subsidiaries of Lonestar after the closings, Wood appears to have indirectly maintained interest in and/or received financial remuneration from both companies via his preferred membership interests in Lonestar or otherwise.

21.    Initially, pursuant to the Coverage Agreement effective December 1, 2005, the policies written by Wood and Highpoint were "master" workers' compensation policies issued on Companion paper to the Wood PEOs.  The Wood PEOs were the named insureds under these master policies, and coverage under the master policies would attach to particular Wood PEO clients when and where the need to insure their employees arose and certain conditions were met.

22.    Effective December 1, 2006, the parties agreed to extend and expand this contractual fronting program arrangement via a new coverage agreement and attendant contracts. This new arrangement, known as the 2006 Coverage Agreement, was entered into by and between Companion, on the one hand, and AMS, Breckenridge, AEI, EGLI, and Dallas National, on the other. Subsequently, through the execution of various extensions of the 2006 Coverage Agreement, AMS II became a party to the 2006 Coverage Agreement. The last extension AMS II executed is dated March 31, 2013. Similarly, Wood became a direct party to the 2006 Coverage Agreement by, among other things, executing the 2006 Coverage Agreement individually and by continuing to do business as two of his dissolved entities, AEI and EGLI, which Wood used to execute extensions to the 2006 Coverage Agreement as well.

23.    AMS, Breckenridge, AMS II, AEI, EGLI, and Dallas National (hereinafter, collectively, the "AMS Entities") are referred to as the "AMS Entities" in the 2006 Coverage Agreement. The 2006 Coverage Agreement states that "[t]he AMS Entities enter into and make this Agreement [*i.e.*, the 2006 Coverage Agreement] jointly and severally." The 2006 Coverage Agreement also states that "[a]ll costs and expenses incurred in connection with the Policies shall be the sole responsibility of the AMS Entities, jointly and severally, and [Companion] shall have absolutely no liability whatsoever in respect thereof."

24.    Pursuant to the 2006 Coverage Agreement, Wood and Highpoint continued writing master insurance policies to the Wood PEOs and started writing both high and low deductible workers' compensation policies and commercial general liability policies to Wood PEOs as well as third-party insureds not owned or controlled by Wood or his affiliated entities (collectively, the "Policies"). In other words, effective December 1, 2006, the 2006 Coverage Agreement expanded the scope of the prior Coverage Agreement by expressly providing for not only the so-called "master policies" issued to AMS and other Wood PEOs, but also "high and low deductible workers' compensation and commercial general liability policies of insurance (together with the Master Policies, the 'Policies')" issued to third parties.

25.    Included as exhibits to the 2006 Coverage Agreement are two separate but related agreements: (i) the Third Party Claims Administration Agreement ("Claims Agreement") between Companion and Aspen, which Wood executed on behalf of Aspen; and (ii) the Guaranty Agreement that Wood, as guarantor, personally executed in favor of, and for the sole benefit of, Companion.

26.    Under the Claims Agreement between Aspen and Companion (Exhibit A to the 2006 Coverage Agreement), Aspen, a third-party claims administrator owned and controlled by Wood, agreed to handle claims arising under the Policies. The Claims Agreement specifies the services Aspen was to provide related to the investigation, adjustment, and payment of claims, and generally required Aspen to make claims payments and allocated loss expenses from a claims operating account in accordance with the 2006 Coverage Agreement.

27.    Under the Guaranty Agreement between Wood and Companion (Exhibit B to the 2006 Coverage Agreement), Wood unconditionally guaranteed the "full and prompt performance and payment" of all obligations of the "Obligors" under the "Subject Agreements" (*i.e.*, the 2006

Coverage Agreement, the Claims Agreement, and the Policies as defined in the 2006 Coverage Agreement) and also agreed to indemnify and hold Companion harmless from and against all claims, damages, losses, or other liabilities "at any time arising out of or otherwise related to, directly or indirectly, the Subject Agreements." More specifically, the Guaranty Agreement states in pertinent part as follows:

I. **Guaranty of Performance and Payment:**

A. GUARANTOR [*i.e.*, Wood] hereby absolutely and unconditionally guarantees to COMPANY [*i.e.*, Companion] the full and prompt performance and payment, when due, of all obligations of each OBLIGOR [*i.e.*, the AMS Entities, jointly and severally] under the Subject Agreements [*i.e.*, the 2006 Coverage Agreement, the Claims Agreement, and the Policies as defined in the 2006 Coverage Agreement]. As used in this Agreement, "prompt" or "promptly" means unconditionally, without request for extension, and within thirty (30) days of COMPANY's written demand for payment.

B. This Agreement is a guaranty of performance and of payment and not of collection, and the liability of GUARANTOR hereunder is direct and unconditional and may be enforced by COMPANY without first resorting to any right or remedy against any OBLIGOR or any other person.

II. **Indemnity:**

A. GUARANTOR hereby agrees to indemnify and hold harmless COMPANY, and all shareholders, officers, directors, employees and other agents of COMPANY, from and against any and all claims, suits, hearings, proceedings, actions, damages, liabilities, fines, penalties, losses, costs or expenses, including without limitation reasonable attorney's fees, at any time arising out of or otherwise related to, directly or indirectly, the Subject Agreements.

B. GUARANTOR shall further pay all reasonable expenses, including without limitation, attorney's fees and other legal expenses, paid or incurred by COMPANY in collecting amounts owed hereunder or otherwise enforcing this Agreement.

28.    The Guaranty Agreement is, therefore, unconditional and comprehensive for any and all realized or potential breaches by the Obligors, as well as for any and all realized or

potential liabilities to which Companion is or ever could be exposed under or in connection with the 2006 Coverage Agreement, the Claims Agreement, or the Policies as defined in the 2006 Coverage Agreement.

29.     In addition, as part of the Guaranty Agreement, Wood executed a Pledge Agreement ("Pledge Agreement") to secure his obligations under the Guaranty Agreement by granting Companion a first priority lien and security interest in certain of the Wood PEOs, including AMS. Among other things, the Pledge Agreement expressly prohibited Wood from selling, transferring, assigning or otherwise disposing of any of the pledged securities or any interest therein without obtaining Companion's prior written consent. Companion's lien applies to, among other things, all earnings and the proceeds of any sale of AMS's assets. As previewed above and discussed further below, Companion has now learned that Wood surreptitiously sold off all of AMS's assets to Essential HR without Companion's knowledge or consent in exchange for an ongoing commission in the business of AMS. And, upon information and belief, on or around March 16, 2016, Wood improperly dissolved or attempted to dissolve AMS and AMS II by filing Articles of Dissolution with the Florida Secretary of State.

30.     Under the 2006 Coverage Agreement and the Policies, the AMS Entities are jointly and severally responsible for paying or reimbursing Companion for all claims payments that fall below (*i.e.*, within) the deductible limit identified in the Policies. Most Policies had a $1 million deductible. The AMS Entities are also obligated to continuously fund a collateral account for Companion's benefit to secure those deductibles; the obligation to fund collateral is in addition to, and not a substitute for, the deductible obligations. Further, pursuant to the 2006 Coverage Agreement and related reinsurance agreements, all claims that exceeded the deductible were to be paid 100% by Wood's reinsurers, including Dallas National, subject to the

reinsurance policies' limits of liability. Wood and the AMS Entities have failed to pay all claims and fund all requested collateral, as required by the 2006 Coverage Agreement, the Guaranty Agreement, and the Policies.

31.     The 2006 Coverage Agreement remains in full force and effect. Paragraph 27 of the 2006 Coverage Agreement provides that "[n]o provision of this Agreement may be amended or waived except pursuant to a writing signed by all of the Parties," *i.e.*, Companion and each of the AMS Entities. Effective March 31, 2013, all of the parties to the 2006 Coverage Agreement executed an agreement—"Extension Agreement #12"—that extended the 2006 Coverage Agreement "until such time as either [Companion] or [Dallas National] gives the other thirty (30) days' prior written notice of termination. All other provisions of the [2006] Coverage Agreement remain in full force and effect." The 2006 Coverage Agreement thus remains operative because, among other reasons, the twelfth extension agreement is the last "writing signed by all of the Parties," and neither Companion nor Dallas National nor any other person or entity has ever provided a written notice of termination.

32.     The Guaranty Agreement likewise remains in full force and effect. Indeed, the Guaranty Agreement expressly states that it is "irrevocable" and that Wood's obligations and liabilities are "continuing, primary, absolute, and unconditional," regardless of any amendment, modification, or waiver of any provision of the 2006 Coverage Agreement or the existence of any other guaranty or other related agreement. The Guaranty Agreement further states that it will not be affected if Companion, "at its sole discretion and without notice" to Wood, decides to "amend, waive, release, compromise, extend or renew for an additional period to time, or otherwise modify (in whole or in part) any Subject Agreement or any other … agreement or instrument related to any Subject Agreement." Moreover, the Guaranty Agreement provides that

"no parol or extrinsic evidence of any nature shall be used to supplement, modify or vary any of the terms hereof."

33.    As an additional layer of protection for Companion to help assure that it would never have any liability with respect to the 2006 Coverage Agreement or the Policies, the AMS Entities agreed to procure and provide to Companion a $20 million letter of credit payable to Companion to protect against any default by any of the AMS Entities under the 2006 Coverage Agreement and/or by Wood under his Guaranty Agreement. More specifically, Paragraph 14 of the 2006 Coverage Agreement states as follows:

> So long as CPCIC [Companion] has any potential liability under any Policy, an AMS Entity shall cause a Letter of Credit to be issued and maintained in favor of CPCIC as beneficiary in the stated amount required by CPCIC from time to time and payable upon written certification by CPCIC of either (i) a default by any AMS Entity under this Agreement or any other agreement with or in favor of CPCIC, or (ii) a default under the Guaranty and Indemnity Agreement referred to in paragraph 15 hereinbelow. Initially the stated amount of such Letter of Credit shall be $20,000,000. Should CPCIC require an increase in the stated amount of the Letter of Credit such increase shall be effected by the AMS Entities within five business days of written notice of such requirement. The Letter of Credit documentation and issuer shall be acceptable to CPCIC in its sole discretion. CPCIC shall not act in bad faith in calling the Letter of Credit. The absence of such bad faith is conclusively established if at the time the Letter of Credit is called an AMS Entity default under this Agreement or the Guaranty and Indemnity Agreement referred to in paragraph 15 hereinbelow either actually existed or was reasonably believed by CPCIC to exist.

34.    Because delivery of this letter of credit is an obligation of the AMS Entities, jointly and severally, under the 2006 Coverage Agreement, Wood, who as explained above guarantees all "performance" and "payment" obligations, must obtain and deliver the letter of credit to Companion if the AMS Entities fail to do so.[3]

---

[3] Companion notes that it has the contractual right to demand the letter of credit from Wood in the first instance, in Companion's sole discretion, because the Guaranty Agreement expressly

35.    Wood and his companies, including AMS, AMS II, Breckenridge, Aspen, and Highpoint, acted as Companion's fiduciaries for certain purposes, including underwriting, producing and/or issuing Policies on Companion paper, first to the AMS Entities and later to unrelated third parties, as well as collecting premiums, collateral, commission payments and premium taxes in connection with the Policies.

36.    For example, Highpoint and Wood acted as Companion's agents for Policy issuance and production purposes and owed Companion a fiduciary duty in connection therewith. Upon information and belief, Wood solely owned and controlled Highpoint, oversaw and was involved in Highpoint's agency duties, and received monthly commission payments.

37.    Upon information and belief, Wood failed to observe corporate formalities in his ownership and operation of AMS, AMS II, Breckenridge, Aspen, and Highpoint; siphoned and commingled the funds of these companies with one another, with his personal finances, and with his other corporate finances; caused or contributed to these companies being undercapitalized; failed to maintain sufficient and separate books and records for each company; and operated these companies as a mere façade for his own activities such that it would be unjust and fundamentally unfair if the acts of the companies are not regarded as the acts of Wood as well.

38.    Since 2005, Wood has exercised control over Companion's data, funds, and reputation. By contract and under common law, Wood and his companies—including but not limited to AMS, AMS II, and Breckenridge (hereinafter, the "AMS Defendants")—have at all times had a duty to provide Companion complete and full disclosure of relevant records concerning with the parties' fronting program relationship, to diligently maintain accurate,

---

provides that it "is a guaranty of performance and of payment and not of collection, and the liability of [Wood] hereunder is direct and unconditional and may be enforced by [Companion] without first resorting to any right or remedy against any [AMS Entity] or any other person."

complete and separate records, and to act in Companion's best interest and to protect its good name.

39.    Upon information and belief, the AMS Defendants, Aspen, Highpoint, Essential HR, and Highpoint Administrative Services, Inc., among other entities, were interchangeable, operated out of the same business address (4455 LBJ Freeway, Suite 1080, Dallas, TX 75244), commingled funds, and impermissibly shared employees to such an extent that it was not possible to keep the various entities and their employees (if any) separate. These entities were effectively separate in name only as they have operated as one and the same for years.

### FOR A FIRST CAUSE OF ACTION
**(Breach of Contract – AMS Defendants' Failure to Provide Letter of Credit)**

40.    Companion incorporates all prior paragraphs by reference as if fully restated herein.

41.    The 2006 Coverage Agreement and attendant agreements, including the Guaranty Agreement, constitute valid and enforceable contracts.

42.    As detailed above, pursuant to the 2006 Coverage Agreement, "[s]o long as [Companion] has any potential liability under any Policy," the AMS Entities jointly and severally agreed to "cause a Letter of Credit to be issued and maintained in favor of [Companion] as beneficiary in the stated amount required by [Companion] from time to time and payable upon written certification by Companion of either (i) a default by any AMS Entity under this [2006 Coverage] Agreement or any other agreement with or in favor of [Companion], or (ii) a default under the [Guaranty Agreement] referred to in paragraph 15 hereinbelow." The 2006 Coverage Agreement further provides that "[i]nitially the stated amount of such Letter of Credit shall be $20,000,000," that if Companion requires "an increase in the stated amount of the Letter of Credit such increase shall be effected by the AMS Entities within five business days of written

notice of such requirement," and that the "Letter of Credit documentation and issuer shall be acceptable to [Companion] in its sole discretion."

43.     Companion performed, tendered performance, or was excused from performing its obligations under the 2006 Coverage Agreement.

44.     Because Companion continues to have liability under the Policies, by letter dated November 4, 2016, Companion demanded that AMS, AMS II, Breckenridge, AEI and/or EGLI cause a letter of credit to be issued and maintained in favor of Companion as beneficiary in the stated amount of $20 million.

45.     The AMS Entities have ignored Companion's November 4, 2016 demand letter and, to date, no AMS Entity has delivered the letter of credit to Companion.

46.     The AMS Defendants have therefore materially breached the 2006 Coverage Agreement and the implied covenant of good faith and fair dealing attendant thereto by, among other things, failing to cause a $20 million letter of credit to be issued and maintained in favor of Companion as beneficiary.

47.     As a result of the AMS Defendants' conduct, Companion is entitled to an award of actual damages, consequential damages, attorneys' fees, the costs of this action, equitable and injunctive relief—including in particular an order directing specific performance of the contract and requiring the AMS Defendants to cause a $20 million letter of credit to be issued and maintained in favor of Companion, as described above—and any such other relief as the Court may determine appropriate.

## FOR A SECOND CAUSE OF ACTION
### (Breach of Contract – Wood's Failure to Provide Letter of Credit)

48.     Companion incorporates all prior paragraphs by reference as if fully restated herein.

49.     The 2006 Coverage Agreement and attendant agreements, including the Guaranty Agreement, constitute valid and enforceable contracts.

50.     Companion performed, tendered performance, or was excused from performing its obligations under the 2006 Coverage Agreement.

51.     As reflected in Paragraph 15 of the 2006 Coverage Agreement, the Guaranty Agreement was "an essential inducement to [Companion] to enter into [the 2006 Coverage Agreement] and issue the Policies" contemplated by the 2006 Coverage Agreement.

52.     Pursuant to Section I.A of the Guaranty Agreement, Wood "absolutely and unconditionally guarantees to [Companion] the full and prompt performance and payment, when due, of all obligations of each OBLIGOR [*i.e.*, the AMS Entities, including the AMS Defendants] under the Subject Agreements [*i.e.*, the 2006 Coverage Agreement, the Claims Agreement, and the Policies as defined in the 2006 Coverage Agreement]." Pursuant to Section I.B, Wood also agreed that his liability under the Guaranty Agreement "is direct and unconditional and may be enforced by [Companion] without first resorting to any right or remedy against any [AMS Entity] or any other person."

53.     As detailed above, pursuant to the 2006 Coverage Agreement, "[s]o long as [Companion] has any potential liability under any Policy," the AMS Entities jointly and severally agreed to, among other things, "cause a Letter of Credit to be issued and maintained in favor of [Companion] as beneficiary in the stated amount required by [Companion] from time to time and payable upon written certification by Companion of either (i) a default by any AMS Entity under this [2006 Coverage] Agreement or any other agreement with or in favor of [Companion], or (ii) a default under the [Guaranty Agreement] referred to in paragraph 15 hereinbelow."

54.     As discussed above, because Companion continues to have liability under the Policies, by letter dated November 4, 2016, Companion demanded that AMS, AMS II, Breckenridge, AEI and/or EGLI cause a letter of credit to be issued and maintained in favor of Companion as beneficiary in the stated amount of $20 million. The AMS Entities have ignored Companion's November 4 letter and, to date, no AMS Entity has delivered this letter of credit to Companion.

55.     Because delivery of this letter of credit is an obligation of the AMS Entities, jointly and severally, under the 2006 Coverage Agreement, Wood, who guarantees all "performance" and "payment" obligations, must obtain and deliver the letter of credit to Companion.

56.     Accordingly, by letter dated November 14, 2016, Companion demanded, among other things, that Wood cause the letter of credit to be issued and maintained in favor of Companion in the stated amount of $20 million.

57.     To date, however, Wood has ignored Companion's November 14, 2016 demand letter, and neither he nor any AMS Entity has caused the letter of credit to be issued to Companion, as required.

58.     Wood has therefore materially breached the 2006 Coverage Agreement, the Guaranty Agreement, and the implied covenant of good faith and fair dealing attendant thereto by, among other things, failing to cause a $20 million letter of credit to be issued and maintained in favor of Companion as beneficiary.

59.     As a result of Wood's conduct, Companion is entitled to an award of actual damages, consequential damages, attorneys' fees, the costs of this action, equitable and injunctive relief—including in particular an order directing specific performance of the contract

and requiring Wood to cause a $20 million letter of credit to be issued and maintained in favor of Companion, as described above—and any such other relief as the Court may determine appropriate.

**FOR A THIRD CAUSE OF ACTION**
**(Breach of Contract – Wood's Failure to Provide Financial Statements)**

60.     Companion incorporates all prior paragraphs by reference as if fully restated herein.

61.     The 2006 Coverage Agreement and attendant agreements, including the Guaranty Agreement, constitute valid and enforceable contracts.

62.     Companion performed, tendered performance, or was excused from performing its obligations under the 2006 Coverage Agreement.

63.     Pursuant to the Guaranty Agreement Wood executed attendant to the 2006 Coverage Agreement, he agreed to provide Companion true and complete financial statements that demonstrate his net worth, among other things. Wood's Guaranty Agreement also provides that if his net worth drops by 10% at any time, he must give written notice to Companion and provide an additional letter of credit in the amount of the diminution.

64.     Specifically, under Section VI of the Guaranty Agreement, Wood is required to "provide [Companion] with a new true and complete financial statement" showing his net worth "as of the prior calendar year end prepared by an independent certified public accountant in accordance with generally accepted accounting principles," and "[e]ach financial statement of [Wood] shall be certified by [Wood] under oath as true, accurate and complete." Wood further agreed to "provide [Companion] with written notice if at any time there is a ten percent (10%) or greater diminution in [Wood's] net worth . . . from that reflected on [Wood's] initial financial statement provided to [Companion] contemporaneously with the execution and delivery of [the

Guaranty Agreement," and, in the event of such diminution, "to collateralize [Wood's] obligations hereunder with either, at [Companion's] option and direction, either: publicly traded securities having a current market value at all times equal to at least One Hundred Percent (100%) of such diminution pursuant to a pledge agreement, or a letter of credit in favor of [Companion] in the amount of such diminution issued by a bank and otherwise in form and substance satisfactory to [Companion] in its sole discretion."

65.     Despite several written requests from Companion, including most recently in a letter dated November 14, 2016, Wood has failed to provide Companion any of the requested information, as required by the Guaranty Agreement.

66.     Wood has therefore materially breached the 2006 Coverage Agreement, the Guaranty Agreement, and the implied covenant of good faith and fair dealing attendant thereto by failing to provide to Companion the requested financial information.

67.     As a result of Wood's conduct, Companion is entitled to an award of actual damages, consequential damages, attorneys' fees, the costs of this action, equitable and injunctive relief—including in particular an order directing specific performance of the contract and requiring Wood to provide to Companion a complete financial statement, prepared by an independent certified public accountant in accordance with generally accepted accounting principles, regarding Wood's net worth as of December 31, 2011 (the first year as to which Wood failed to provide the required financial statement), and for each year-end thereafter, including as of December 31, 2016, as well as the other information required by the Guaranty Agreement—and any such other relief as the Court may determine appropriate.

## FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract – Wood's Failure to Provide Information Regarding Pledged Securities and His Improper Sale and Dissolution of AMS and AMS II)

68.    Companion incorporates all prior paragraphs by reference as if fully restated herein.

69.    The 2006 Coverage Agreement and attendant agreements, including the Guaranty Agreement and the Pledge Agreement, constitute valid and enforceable contracts.

70.    Companion performed, tendered performance, or was excused from performing its obligations under the 2006 Coverage Agreement.

71.    As discussed above, to assure that Wood will fully comply with his Guaranty Agreement, he pledged additional collateral in the form of a "first priority lien and security interest" in, among other things, AMS's stock and assets. Section V of the Guaranty Agreement provides as follows:

> To secure [Wood's] obligations under [the Guaranty Agreement,] [Wood] shall grant [Companion] a first priority lien and security interest in all of the AMS Stock pursuant to a pledge agreement in the form attached hereto as <u>Exhibit B-1</u> and [Wood] shall execute and deliver such pledge agreement to [Companion] contemporaneously with the execution and delivery of this [Guaranty Agreement].

72.    Under the referenced Pledge Agreement, "Pledgor" Wood granted "Secured Party" Companion "a first priority lien and security interest in all of the issued and outstanding equity interests" of five (5) Wood PEOs, including AMS, "together with all earnings thereon, all additions thereto, all proceeds thereof from sale or otherwise, all substitutions therefor, and all securities issued with respect thereto as a result of any stock dividend, stock split, warrants or other rights, reclassification, adjustment or other change in the capital structure of the issuer of such equity interests, and the securities of any company or other properties received upon the conversion or exchange thereof pursuant to any merger, consolidation, reorganization, sale of

21

assets or other agreement, or received upon any liquidation or any issuer of such equity interests

(collectively, the 'Pledged Securities')." The Pledge Agreement further provides that at "[a]ny

time upon demand of [Companion], [Wood] shall deliver to [Companion] . . . the certificates or

other instruments evidencing the Pledged Securities, together with appropriate transfer powers

(or other suitable instrument of transfer) therefor duly executed by [Wood] in blank."

73.     In a letter dated November 14, 2016, Companion demanded that Wood, among

other things, deliver to Companion within 30 days the certificates or other instruments

evidencing the Pledged Securities, together with appropriate transfer powers or other suitable

instrument of transfer, duly executed by Wood in blank. In its November 14, 2016 demand letter,

Companion further explained:

> For the avoidance of doubt, Companion demands that Mr. Wood deliver
> to Companion any properties received and/or rights obtained pursuant to
> any sale of any assets of AMS Staff Leasing, Inc., AMS Staff Leasing II,
> Inc., AMS Staff Leasing, NA, Personnel Advantage East, Inc., and
> Equity Group Leasing I, Inc., including, but not limited to, delivery to
> Companion of any past consideration paid to, as well as the right to any
> future consideration payable to, Mr. Wood and/or AMS Staff Leasing,
> Inc., AMS Staff Leasing II, Inc., AMS Staff Leasing, NA, Personnel
> Advantage East, Inc., and Equity Group Leasing I., Inc. as consideration
> for sale of any assets of AMS Staff Leasing, Inc., AMS Staff Leasing II,
> Inc., AMS Staff Leasing, NA, Personnel Advantage East, Inc., and
> Equity Group Leasing I., Inc.

74.     To date, Wood has ignored this demand and has failed to provide the requested

information to Companion.

75.     In addition, even though the Pledge Agreement makes clear that "Pledgor [Wood]

shall not sell, transfer, assign or otherwise dispose of any of the Pledged Securities or any

interest therein without obtaining the prior written consent of Secured Party [Companion],"

Companion recently learned that, upon information and belief, Wood surreptitiously sold all of

AMS's assets to Essential HR, without Companion's knowledge or consent, in exchange for

ongoing commission in AMS business and/or other benefits or financial remuneration; and, as a result of the sale or liquidation of AMS's assets, AMS is now a shell company with no assets. In further breach of the Pledge Agreement, upon information and belief, on or around March 16, 2016, Wood improperly dissolved or attempted to dissolve AMS and AMS II.

76.    Accordingly, Wood has materially breached the Guaranty Agreement, the Pledge Agreement, and the implied covenant of good faith and fair dealing attendant thereto by, among other things, (i) failing to provide to Companion the certificates or other instruments evidencing the Pledged Securities, together with appropriate transfer powers or other suitable instrument of transfer, duly executed by Wood in blank; (ii) selling off AMS's assets without Companion's knowledge or consent and to its detriment; and (iii) dissolving or attempting to dissolve AMS and AMS II.

77.    As a result of Wood's conduct—which constitutes gross negligence, willful misconduct, and/or bad faith—Companion is entitled to an award of actual damages, consequential damages, attorneys' fees, the costs of this action, equitable and injunctive relief—including in particular an order directing specific performance of the contract and requiring Wood to provide to Companion the certificates or other instruments evidencing the Pledged Securities, together with appropriate transfer powers or other suitable instrument of transfer, duly executed by Wood in blank, and to deliver to Companion any properties received and/or rights obtained pursuant to any sale of any assets of AMS, AMS II, AMS NA, Breckenridge, AEI, and/or EGLI, including, but not limited to, delivery to Companion of any past consideration paid to, as well as the right to any future consideration payable to, Wood and/or AMS, AMS II, AMS NA, Breckenridge, AEI, and/or EGLI as consideration for sale of any assets of AMS, AMS II,

AMS NA, Breckenridge, AEI, and/or EGLI—and any such other relief as the Court may determine appropriate.

## FOR A FIFTH CAUSE OF ACTION
### (Breach of Contract Accompanied by a Fraudulent Act –
### Wood and AMS – Sale and Dissolution of AMS and AMS II)

78.    Companion incorporates all prior paragraphs by reference as if fully restated herein.

79.    The 2006 Coverage Agreement and attendant agreements, including the Guaranty Agreement and the Pledge Agreement, constitute valid and enforceable contracts.

80.    Companion performed, tendered performance, or was excused from performing its obligations under the 2006 Coverage Agreement.

81.    As previously discussed, under Section V of the Guaranty Agreement, Companion required Wood, and Wood agreed, to enter into the Pledge Agreement in order to secure his obligations under the Guaranty Agreement. Under the Pledge Agreement, Wood granted Companion "a first priority lien and security interest in all of the issued and outstanding equity interests" of five (5) Wood PEOs, including AMS, together with all earnings and proceeds thereof from a sale or otherwise. The Pledge Agreement explicitly prohibited Wood from selling, transferring, assigning or otherwise disposing of any of the pledged securities or any interest therein without obtaining Companion's prior written consent.

82.    Upon information and belief, without Companion's knowledge or consent, Wood improperly transferred or caused AMS to transfer all of its assets to Essential HR, and improperly dissolved or attempted to dissolve AMS and AMS II on or around March 16, 2016.

83.    By raiding AMS's assets and purporting to dissolve both AMS and AMS II, Wood violated the Guaranty Agreement, the Pledge Agreement, and applicable state law. Upon

information and belief, Wood, AMS, and AMS II acted in bad faith and/or with a fraudulent intent by, among other things, concealing this information from Companion and by intentionally seeking to (i) avoid providing Companion the various protections contemplated by the parties' agreements, (ii) limit or escape liability under the agreements, and (iii) misappropriate the assets of AMS for their own benefit and to Companion's detriment. Wood's and AMS's secret raiding of AMS's assets and attempt to dissolve both AMS and AMS II are fraudulent acts characterized by dishonesty in fact, unfair dealing, and amount to the intentional misappropriation of property in which Companion has an interest.

84.    As a result of Wood's, AMS's, and AMS II's conduct, Companion has suffered, and continues to suffer, damages and is entitled to an award of actual and punitive damages, attorneys' fees, the costs of this action, equitable and injunctive relief, and any such other relief as the Court may determine appropriate.

**FOR A SIXTH CAUSE OF ACTION**
**(Civil Conspiracy –Defendants)**

85.    Companion incorporates all prior paragraphs by reference as if fully restated herein.

86.    Upon information and belief, Defendants knowingly participated in and conspired to carry out the breaches and other misconduct described above relating to the dissolution of AMS and transfer of its assets to Essential HR for the purpose of injuring Companion and exposing it to liability that was rightly attributable to AMS and Wood, as its guarantor.

87.    Upon information and belief, by acquiring the AMS business and diverting benefits therefrom to Wood, Essential HR, Karen Meredith (who initially acquired AMS's assets from Wood) and/or Lynn Hanson (the current owner of Essential HR) participated in and/or

acted with knowledge that their conduct would advance the conspiracy and further expose Companion to liability that was rightly attributable to AMS and Wood, as its guarantor.

88.     Defendants' conspiracy has caused Companion special damages, including *inter alia* forcing Companion to account for liabilities and exposure under the 2006 Coverage Agreement that should have been resolved by AMS and impairing or diminishing the assets of AMS and AMS II. As a result of Defendants' conspiracy and wrongful conduct, Companion has suffered, and continues to suffer, damages and is entitled to an award of special damages, attorneys' fees, the costs of this action, equitable and injunctive relief, and any such other relief as the Court may determine appropriate.

### FOR A SEVENTH CAUSE OF ACTION
### (Fraudulent Conveyance – Wood)

89.     Companion incorporates all prior paragraphs by reference as if fully restated herein.

90.     Under the Guaranty Agreement and the Pledge Agreement, Wood has, at all times relevant to this action, been a debtor who, among other things, owed Companion a first priority lien and security interest in AMS's assets. As such, Companion became and remains a creditor of Wood and AMS.

91.     As part of the above-described asset protection scheme, however, Wood secretly transferred all of AMS's assets to Essential HR for the purposes of making Wood and AMS judgment proof and with an actual intent to defraud and injure Companion by exposing it to liability that was rightly attributable to AMS and Wood.

92.     Indeed, Wood intentionally raided and sold off all of AMS's assets and improperly enriched himself, Essential HR, Karen Meredith, and/or Lynn Hanson while knowingly indebted to Companion for various liabilities and exposures arising under or in

connection with the 2006 Coverage Agreement and the Policies such that Wood's intent to defraud Companion is imputable to his grantees.

93.     As a result of Wood's fraudulent transfer, AMS is now just a shell company with no assets, and Companion has been forced to account for millions of dollars in liabilities and exposure that should have been resolved by AMS and/or Wood as guarantor, indemnitor, and pledgor.

94.     As a result of Wood's self-dealing and fraudulent conduct, the fraudulent transfer should be set aside. Companion has suffered, and continues to suffer, damages and is entitled to an award of damages, attorneys' fees, the costs of this action, equitable and injunctive relief, and any such other relief as the Court may determine appropriate.

### FOR AN EIGHTH CAUSE OF ACTION
#### (Indemnification – Wood)

95.     Companion incorporates all prior paragraphs by reference as if fully restated herein.

96.     Pursuant to the Guaranty Agreement, Wood's obligation and guarantee of full performance requires that he indemnify and hold Companion harmless for some or all of the demands or claims made by Companion as referenced herein. The Guaranty Agreement also expressly obligates Wood to "indemnify and hold Companion harmless from and against any and all claims, suits, hearings, proceedings, actions, damages, liabilities, fines, penalties, losses, costs, or expenses, including without limitation reasonable attorneys' fees, at any time arising out of or otherwise related to, directly or indirectly," the 2006 Coverage Agreement, the Claims Agreement, and/or the Policies.

97.     The instant case is "related to, directly or indirectly," the 2006 Coverage Agreement and/or the Policies.

98.     Wood has not agreed to indemnify and hold harmless Companion for full performance and prompt payment as required by the Guaranty Agreement.

99.     Companion is entitled to an award of actual damages, consequential damages, attorneys' fees, the costs of this action, equitable and injunctive relief, and such other relief as the Court may determine appropriate for Wood's failure to comply with the Guaranty Agreement.

## **PRAYER**

WHEREFORE, Companion respectfully asks that this Court enter an award in favor of Companion against Defendants for actual damages, consequential damages, general damages, exemplary damages, special damages, punitive damages, attorneys' fees, costs of this action, equitable relief, injunctive relief, prejudgment interest, post-judgment interest, and such other relief as the Court may determine appropriate.

Respectfully submitted,

WOMBLE CARLYLE SANDRIDGE & RICE, LLP

By: /s/ Kevin A. Hall
Federal Bar No. 5375
*kevin.hall@wcsr.com*
M. Todd Carroll
Federal Bar No. 9742
*todd.carroll@wcsr.com*
1727 Hampton Street
Columbia, South Carolina 29201
803-454-6504

STEPTOE & JOHNSON LLP

Harry Lee
*hlee@steptoe.com*
Conor P. Brady
*cbrady@steptoe.com*
*Applications for Admission Pro Hac Vice Forthcoming*
1330 Connecticut Avenue, NW
Washington, DC 20036
202-429-8112

Attorneys for Companion Property and Casualty Insurance Company

February 23, 2017
Columbia, South Carolina